ANDREW L. PACKARD (State Bar No. 168690)
MEGAN E. TRUXILLO (State Bar No. 275746)
Law Offices of Andrew L. Packard
100 Petaluma Blvd. N., Suite 301
Petaluma, CA 94952
Tel: (707) 763-7227
Fax: (707) 763-9227
Email: Andrew@packardlawoffices.com
          Megan@packardlawoffices.com

Fredric Evenson (State Bar No. 198059)
ECOLOGY LAW CENTER
P.O. Box 1000
Santa Cruz, CA 95061
Telephone: (831) 454-8216
Email: evenson@ecologylaw.com

Attorneys for Plaintiff
ECOLOGICAL RIGHTS FOUNDATION

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
## WESTERN DIVISION

| | |
|---|---|
| ECOLOGICAL RIGHTS FOUNDATION, a non-profit corporation,<br><br>                    Plaintiff,<br><br>          vs.<br><br>CITY OF LOMPOC, CLAUDIA STINE, KEITH QUINLAN, and GALE GREER,<br><br>                    Defendants. | Case No.<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES**<br><br>(Federal Water Pollution Control Act, 33 U.S.C. §§ 1251–1387) |

ECOLOGICAL RIGHTS FOUNDATION ("EcoRights"), by and through its counsel, hereby alleges:

## I.    JURISDICTION AND VENUE

1.    This is a civil suit brought under the citizen suit enforcement provision of the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251–1387 (the "Clean Water

Act", the "CWA" or "the Act") against the CITY OF LOMPOC, CLAUDIA STINE, KEITH QUINLAN, and GALE GREER (collectively referred to as "LOMPOC" or "Defendants").  This Court has subject matter jurisdiction over the parties and the subject matter of this action pursuant to Section 505(a)(1) of the Act, 33 U.S.C. § 1365(a), and 28 U.S.C. § 1331 (an action arising under the laws of the United States). Specifically, this action arises under Section 505(a)(1)(A) of the Act, 33 U.S.C. § 1365(a)(1)(A) (citizen suit to enforce effluent standard or limitation).  The relief requested is authorized pursuant to 33 U.S.C. §1365(a) (injunctive relief), 33 U.S.C. §§ 1365(a), 1319(d) (civil penalties), and 28 U.S.C. §§ 2201–2202 (power to issue declaratory relief in case of actual controversy and further necessary relief based on such a declaration).

2.     On or about April 10, 2015, Plaintiff provided written notice to Defendants, via certified mail, of Defendants' violations of the Act ("CWA Notice Letter"), and of their intention to file suit against Defendants, as required by the Act. *See* 33 U.S.C. § 1365(b)(1)(A); 40 C.F.R. § 135.2(a)(1) (1991).  Plaintiff mailed a copy of the CWA Notice Letter to the Administrator of the United States Environmental Protection Agency ("EPA"); the Administrator of EPA Region IX; the Executive Director of the State Water Resources Control Board ("State Board"); and the Executive Officer of the Regional Water Quality Control Board, Central Valley Region ("Regional Board"), pursuant to 40 C.F.R. § 135.2(a)(1) (1991).  A true and correct copy of EcoRights' CWA Notice Letter is attached hereto as Exhibit A, and is incorporated by reference.

3.     More than sixty days have passed since Plaintiff served this CWA Notice Letter on Defendants and the agencies.  Plaintiff is informed and believes, and thereupon alleges, that neither the EPA nor the State of California has commenced nor is diligently prosecuting a court action to redress the violations alleged in this Complaint.  This action's claims for civil penalties are not barred by any prior administrative penalty under Section 309(g) of the Act, 33 U.S.C. § 1319(g).

Complaint For Declaratory and
Injunctive Relief and Civil Penalties

4.     Venue is proper in the Central District of California pursuant to Section 505(c)(1) of the Act, 33 U.S.C. § 1365(c)(1), because the sources of the violations are located within this District.  Venue is also proper under 28 U.S.C. § 1391(b) because Defendants reside in this District and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.  Intra-district venue is proper in Los Angeles, California, because the sources of the violations are located within Santa Barbara County.

## II.     **INTRODUCTION**

5.     This Complaint seeks relief for Defendants' violations of the CWA at the approximately 115-acre landfill facility owned and/or operated by Defendants (the "Facility").  The Facility is located at 700 Avalon Road, in Lompoc, California. Defendants discharge pollutant-contaminated storm water from the Facility into San Miguelito Creek, the Santa Ynez River and ultimately into the Pacific Ocean. Defendants are in violation of both the substantive and procedural requirements of the CWA.

6.     Defendants' discharge of pollutant-contaminated storm water from the Facility is in violation of the Act and the State of California's General Industrial Permit for storm water discharges, State Water Resources Control Board ("State Board") Water Quality Order No. 91-13-DWQ, as amended by Water Quality Order No. 92-12-DWQ and Water Quality Order No. 97-03-DWQ, National Pollutant Discharge Elimination System ("NPDES") General Permit No. CAS000001 (hereinafter "General Permit" or "Permit").  Defendants' violations of the filing, monitoring, reporting, discharge and management practice requirements, and other procedural and substantive requirements of the General Permit and the Act are ongoing and continuous.

7.     The failure on the part of industrial facility operators such as Defendants to comply with the General Permit is recognized as a significant cause of the continuing decline in water quality of receiving waters, such as San Miguelito

Complaint For Declaratory and
Injunctive Relief and Civil Penalties

Creek, the Santa Ynez River and the Pacific Ocean.  The general consensus among regulatory agencies and water quality specialists is that storm water pollution amounts to more than half the total pollution entering the marine environment each year.  With every rainfall event, hundreds of thousands of gallons of polluted storm water originating from industrial facilities discharge to San Miguelito Creek, the Santa Ynez River and the Pacific Ocean.

## III.   **PARTIES**

8.      Plaintiff EcoRights is a non-profit public benefit corporation organized under the laws of California, with its main office in Garberville, California. EcoRights' purpose is to educate the public about environmental practices which cause harm to human health, the environment and other natural resources, and to seek redress from those harms through litigation or alternative dispute resolution. EcoRights represents citizens in protecting California's waterways from pollution, securing the multitude of benefits that flow from clean, vibrant waters: safe drinking water, abundant and diverse wildlife populations, healthy recreational opportunities, and economic prosperity from commercial fishing, tourism, and other commercial activities that depend on clean water. To further its goals, EcoRights actively seeks federal and state agency implementation of state and federal water quality laws, including the CWA, and as necessary, directly initiates enforcement actions on behalf of itself and its members.

9.      Members of EcoRights, including citizens, taxpayers, property owners, and residents, live, work, travel and recreate near San Miguelito Creek, the Santa Ynez River and the Pacific Ocean near the mouth of the Santa Ynez River (hereinafter collectively referred to as "impacted waters"), into which LOMPOC causes pollutants to be discharged.  These EcoRights members use and enjoy the impacted waters for recreational, educational, scientific, conservation, aesthetic, and spiritual purposes. LOMPOC's alleged discharge of stormwater containing pollutants impairs each of those uses. Thus, the interests of EcoRights' members have been, are being, and will

Complaint For Declaratory and
Injunctive Relief and Civil Penalties

4

continue to be adversely affected by LOMPOC's failure to comply with the Clean Water Act and the General Permit.

10. Members of EcoRights reside in California and use and enjoy California's numerous rivers for recreation and other activities. Members of EcoRights use and enjoy the waters of San Miguelito Creek, the Santa Ynez River, and/or the Pacific Ocean, into which Defendants have caused, are causing, and will continue to cause, pollutants to be discharged. Members of EcoRights use these areas to fish, sail, boat, kayak, swim, bird watch, view wildlife, and engage in scientific study, including monitoring activities, among other things. Defendants' discharges of pollutants threaten or impair each of those uses or contribute to such threats and impairments. Thus, the interests of EcoRights' members have been, are being, and will continue to be adversely affected by Defendants' ongoing failure to comply with the Clean Water Act. The relief sought herein will redress the harms to Plaintiff caused by Defendants' activities.

11. Continuing commission of the acts and omissions alleged above will irreparably harm Plaintiffs and the citizens of the State of California, for which harm they have no plain, speedy or adequate remedy at law.

12. Plaintiff is informed and believes, and thereupon alleges that Defendants CITY OF LOMPOC, CLAUDIA STINE, KEITH QUINLAN, and GALE GREER own and/or operate the Facility.

## IV.   LEGAL BACKGROUND

### A.   Clean Water Act

13. Congress enacted the CWA to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). The CWA establishes an "interim goal of water quality which provides for the protection and propagation of fish, shellfish, and wildlife and provides for recreation in and on the water . . . ." 33 U.S.C. § 1251(a)(2). To these ends, Congress developed both a water quality-based and technology-based approach to regulating discharges of

Complaint For Declaratory and
Injunctive Relief and Civil Penalties

pollutants from point sources into waters of the United States.

14.     Section 301(a) of the Act, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant from a point source into waters of the United States, unless such discharge is in compliance with various enumerated sections of the Act.  Among other things, Section 301(a) prohibits discharges not authorized by, or in violation of, the terms of an NPDES permit issued pursuant to Section 402 of the Act, 33 U.S.C. § 1342.

15.     The term "discharge of pollutants" means "any addition of any pollutant to navigable waters from any point source."  33 U.S.C. § 1362(12).  Pollutants are defined to include, among other examples, industrial waste, chemical wastes, biological materials, heat, rock, and sand discharged into water.  33 U.S.C. § 1362(6).

16.     A point source is defined as "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, [or] conduit . . . from which pollutants are or may be discharged."  33 U.S.C. § 1362(14).

17.     "Navigable waters" means "the waters of the United States."  33 U.S.C. § 1362(7).  Waters of the United States includes, among others things, waters that are, were, or are susceptible to use in interstate commerce, and tributaries to such waters.  33 C.F.R § 328.3 (a) (1986).

18.     Section 402(p) of the Act establishes a framework for regulating municipal and industrial storm water discharges under the NPDES program, 33 U.S.C. §1342(p), and, specifically, requires an NPDES permit for storm water discharges associated with industrial activity.  *Id.* § 1342(p)(2)(B).

19.     Section 505(a)(1) provides for citizen enforcement actions against any "person," including individuals, corporations, or partnerships, 33 U.S.C. § 1362(5), for violations of NPDES permit requirements and for unpermitted discharges of pollutants.  33 U.S.C. §1365(a)(1) (authorizing actions against any person alleged to be in violation of an effluent standard or limitation); *id.* §1365(f) (defining "effluent

Complaint For Declaratory and
Injunctive Relief and Civil Penalties

limitation" broadly to include "a permit or condition thereof issued under [section 402] of this title," and "any unlawful act under subsection (a) of [section 301] of this title").

20.     An action for injunctive relief under the Act is authorized by 33 U.S.C. § 1365(a).  Violators of the Act are also subject to an assessment of civil penalties of up to $37,500 per day for violations occurring after January 12, 2009, pursuant to Sections 309(d) and 505 of the Act, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. §§ 19.1–19.4 (2008).

**B.     State Regulations**

21.     The Santa Ynez River is heavily degraded from pollutant loading.  This is officially recognized by the EPA, the State Board and the Regional Board, which have placed it on the CWA section 303(d) list of waters that are so polluted that they do not meet applicable water quality standards. The Regional Board's Basin Plan is the master policy document setting forth the legal, technical, and programmatic bases of water quality regulation in the Region.  Among other things, the Basin Plan includes the water quality objectives needed to protect the designated beneficial water uses.  The Basin Plan sets forth narrative water quality objectives for sediment, settleable and suspended materials, as well as narrative objectives for not impairing water quality with oil sheens, turbidity, or other nuisance conditions.  The Basin Plan also includes numeric water quality standards for pH, dissolved oxygen and toxic pollutants as well as site specific objective for certain pollutants of concern such as copper, lead, and zinc.

22.     The Santa Ynez River is listed on the section 303(d) list as impaired for chloride, *E. Coli*, fecal coliform, low dissolved oxygen, sedimentation/siltation, sodium, temperature, and total dissolved solids.

23.     San Miguelito Creek is also listed on the section 303(d) list as impaired for chloride, pH, sodium and temperature.

24.     In addition, a rule promulgated by EPA known as the California Toxics

Complaint For Declaratory and
Injunctive Relief and Civil Penalties

Rule ("CTR"), discussed further below, sets Water Quality Standards ("WQS") for 126 toxic priority pollutants in California's rivers, lakes, enclosed bays, and estuaries. The CTR, which applies to San Miguelito Creek and the Santa Ynez River, and includes limits for several toxic metals.

### C.  California Industrial Storm Water General Permit

25.     Section 402 authorizes states with approved NPDES permit programs to regulate industrial storm water discharges through individual permits issued to dischargers and/or through the issuance of a single, statewide general permit applicable to all industrial storm water dischargers.  33 U.S.C. § 1342(b).

26.     Pursuant to Section 402 of the Act, 33 U.S.C. § 1342, the Administrator of EPA has authorized California's State Board to issue NPDES permits including general NPDES permits in California.

27.     The State Board elected to issue a statewide general permit for industrial discharges.  The State Board issued the General Permit on or about November 19, 1991, modified the General Permit on or about September 17, 1992, and reissued the General Permit on or about April 17, 1997, pursuant to Section 402(p) of the Clean Water Act, 33 U.S.C. § 1342(p).

28.     Facilities discharging, or having the potential to discharge, storm water associated with industrial activity that have not obtained an individual NPDES permit must apply for coverage under the State's General Permit by filing a Notice of Intent ("NOI").  The General Permit requires existing facilities to file their NOIs before March 30, 1992.

29.     Once regulated by a NPDES permit, facilities must strictly comply with all of the terms and conditions of the Permit.  A violation of the General Permit is a violation of the Act. *See* General Permit, Section C(1) (Standard Provisions).

30.     In order to discharge storm water lawfully in California, industrial dischargers must comply with the terms of the General Permit or have obtained and complied with an individual NPDES permit.

Complaint For Declaratory and
Injunctive Relief and Civil Penalties

31.     The General Permit contains three primary and interrelated categories of requirements: 1) discharge prohibitions; 2) Storm Water Pollution Prevention Plan ("SWPPP") requirements; and 3) monitoring and reporting requirements, including the requirement to prepare an annual report.

32.     Discharge Prohibition A(1) of the General Permit prohibits the direct or indirect discharge of materials other than storm water ("non-storm water discharges"), which are not otherwise regulated by an NPDES permit, to the waters of the United States.  Discharge Prohibition A(2) of the General Permit prohibits storm water discharges and authorized non-storm water discharges that cause or threaten to cause pollution, contamination or nuisance.  Receiving Water Limitation C(1) of the General Permit prohibits storm water discharges to any surface or ground water that adversely impact human health or the environment.  Receiving Water Limitation C(2) of the General Permit prohibits storm water discharges that cause or contribute to an exceedance of any applicable water quality standards contained in a Statewide Water Quality Control Plan, the applicable Regional Board's Basin Plan, or the Criteria for Priority Toxic Pollutants for the State of California ("CTR"), 40 C.F.R. § 131.38 (2013).  (See, 65 Fed. Reg. 31682.)

33.     Effluent Limitation B(3) of the General Permit requires dischargers to reduce or prevent pollutants in their storm water discharges through implementation of the Best Available Technology Economically Achievable ("BAT") for toxic and nonconventional pollutants and the Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants.  BAT and BCT include both nonstructural and structural measures.  General Permit, Section A(8).

34.     EPA has established Benchmark Levels as guidelines for determining whether a facility discharging industrial storm water has implemented the requisite BAT and BCT standards.  65 Fed. Reg. 64746, 64767 (Oct. 30, 2000).  The following benchmarks have been established for pollutants discharged by Defendants: Total Suspended Solids – 100 mg/L; Chemical Oxygen Demand – 120 mg/L; and Iron – 1

Complaint For Declaratory and
Injunctive Relief and Civil Penalties

mg/L.  The State Board has proposed adding a benchmark level for Specific Conductance of 200 μmhos/cm and Total Organic Carbon – 110 mg/L.

35.     The Regional Board has established water quality standards for San Miguelito Creek, the Santa Ynez River and the Pacific Ocean Bay in the Water Quality Control Plan for the Central Coast Basin, generally referred to as the "Basin Plan."

36.     The Basin Plan includes a toxicity standard which states that "[a]ll waters shall be maintained free of toxic substances in concentrations which are toxic to or which produce detrimental physiological responses in, human, plant, animal, or aquatic life."

37.     The Basin Plan provides that "[w]aters shall not contain concentrations of chemical constituents known to be deleterious to fish or wildlife."

38.     The Basin Plan provides that "[a]t a minimum, water designated for use as domestic or municipal supply (MUN) shall not contain concentrations of chemical constituents in excess of the maximum contaminant levels (MCLs)."

39.     EPA issued the CTR in 2000, establishing numeric receiving water limits for certain toxic pollutants in California surface waters.  40 C.F.R. § 131.38 (2013).  The CTR establishes the following numeric limits for freshwater surface waters:  arsenic – 0.34 mg/L (maximum concentration) and 0.150 mg/L; chromium (III) – 0.550 mg/L (maximum concentration); copper – 0.013 mg/L (maximum concentration); and lead – 0.065 mg/L (maximum concentration), subject to water hardness.

40.     Dischargers must develop and implement a SWPPP before October 1, 1992.  General Permit, Section A(1), Provision E(2).  The purpose of the SWPPP is to identify sources of pollutants in storm water discharges, implement BMPs to reduce exposure to these sources, and reduce or prevent the pollutants in storm water runoff. General Permit, Section A(2).  The SWPPP must comply with the BAT and BCT standards. General Permit, Section B(3).  The SWPPP must include, among other

Complaint For Declaratory and
Injunctive Relief and Civil Penalties

elements:  (1) a narrative description and summary of all industrial activity, potential sources of pollutants and potential pollutants; (2) a site map showing facility boundaries, the storm water conveyance system, associated points of discharge, direction of flow, areas of industrial activities, and areas of actual and potential pollutant contact; (3) a description of storm water management practices, best management practices ("BMPs") and preventive maintenance undertaken to avoid storm water contamination that achieve BAT and BCT; (4) the location where Significant Materials are being shipped, stored, received and handled, as well as the typical quantities of such materials and the frequency with which they are handled; (5) a description of potential pollutant sources including industrial processes, material handling and storage areas, dust and particulate generating activities; (6) a summary of storm water sampling points; (7) a description of individuals and their responsibilities for developing and implementing the SWPPP; (8) a description of potential pollutant sources including industrial processes, material handling and storage areas, and dust and particulate generating activities; (9) a description of significant spills and leaks; (10) a list of all non-storm water discharges and their sources; and (11) a description of locations where soil erosion may occur.  The SWPPP must also include an assessment of potential pollutant sources at the Facility and a description of the BMPs to be implemented at the Facility that will reduce or prevent pollutants in storm water discharges and authorized non-storm water discharges, including structural BMPs where non-structural BMPs are not effective. General Permit Sections A(1) through A(9).

41.     Dischargers must reevaluate their SWPPP and site maps annually to ensure effectiveness and must revise them where necessary.  General Permit, Section A(1), B(3) and (4).  Section C(3) of the General Permit requires a discharger to prepare and submit a report to the Regional Board describing changes it will make to its current BMPs in order to prevent or reduce any pollutant in its storm water discharges that is causing or contributing to an exceedance of water quality standards.

Complaint For Declaratory and
Injunctive Relief and Civil Penalties

Once approved by the Regional Board, the additional BMPs must be incorporated into the Facility's SWPPP.  The report must be submitted to the Regional Board no later than 60 days from the date the discharger first learns that its discharge is causing or contributing to an exceedance of an applicable water quality standard.  Section C(4)(a).  Section C(11)(d) of the General Permit's Standard Provisions also requires dischargers to report any noncompliance.  *See also* Section E(6).  Lastly, Section A(9) of the General Permit requires an annual evaluation of storm water controls including the preparation of an evaluation report and implementation of any additional measures in the SWPPP to respond to the monitoring results and other inspection activities.

42.     The General Permit requires dischargers to eliminate all non-storm water discharges to storm water conveyance systems other than those specifically set forth in Special Condition D(1)(a) of the General Permit and meeting each of the conditions set forth in Special Condition D(1)(b).

43.     The General Permit requires dischargers commencing industrial activities before October 1, 1992 to develop and implement an adequate written Monitoring and Reporting Program no later than October 1, 1992.  Existing facilities covered under the General Permit must implement all necessary revisions to their monitoring programs no later than August 1, 1997.

44.     The General Permit also requires dischargers to submit yearly "Annual Reports" to the Regional Board.  As part of their monitoring program, dischargers must identify all storm water discharge locations that produce a significant storm water discharge, evaluate the effectiveness of BMPs in reducing pollutant loading, and evaluate whether pollution control measures set out in the SWPPP are adequate and properly implemented.  Dischargers must then conduct visual observations of these discharge locations for at least one storm per month during the wet season (October through May) and record their findings in their Annual Report.  Dischargers must also collect and analyze storm water samples from at least two storms per year.  Section B requires dischargers to sample and analyze during the wet season for basic parameters

Complaint For Declaratory and
Injunctive Relief and Civil Penalties

such as pH, total suspended solids ("TSS"), specific conductance ("SC"), and total organic carbon ("TOC") or oil and grease ("O&G"), certain industry-specific parameters, and toxic chemicals and other pollutants likely to be in the storm water discharged from the facility.  Dischargers must also conduct dry season visual observations to identify sources of non-storm water pollution.  The monitoring and reporting program requires dischargers to certify, based upon the annual site inspections, that the facility is in compliance with the General Permit and report any non-compliance, and contains additional requirements as well.

## V.      STATEMENT OF FACTS

40.     The Facility is classified as conforming to Standard Industrial Classification ("SIC") Code 4953 ("Hazardous Waste Treatment Storage or Disposal").  Industrial activities occur throughout the Facility.  EcoRights' investigations into the industrial activities at Defendants' approximately 115-acre facility indicate the Facility is used to process and store waste paper, plastic, metals, and glass; scrap metals including aluminum and steel; waste oils and greases; treated wood wastes; agricultural waste; and electronic waste.  The Facility also temporarily stores and processes general industrial and household hazardous waste, including: fluorescent light bulbs, ballasts, paints, stains, solvents, pesticides, herbicides, automotive products, and cleaning products.  In addition, the Facility stores tires, bicycles, and automotive scrap metal.  Furthermore, the Facility also stores and processes green waste on site.

41.     Most of these activities occur outside in areas that are exposed to storm water and storm flows due to the lack of overhead coverage, functional berms and other storm water controls.  Plaintiff is informed and believes that Defendants' storm water controls, to the extent any exist, fail to achieve BAT and BCT standards.

42.     The management practices at the Facility are wholly inadequate to prevent the sources of contamination described above from causing the discharge of pollutants to waters of the United States and fail to meet BAT and BCT standards.

Complaint For Declaratory and
Injunctive Relief and Civil Penalties

The Facility lacks essential structural controls such as grading, berming and roofing to prevent rainfall and storm water flows from coming into contact with these and other sources of contaminants, thereby allowing storm water to flow over and across these materials and become contaminated prior to leaving the Facility. In addition, the Facility lacks structural controls to prevent the discharge of water once contaminated. The Facility also lacks an adequate filtration system to treat water once it is contaminated.

43.     Vehicle traffic at the Facility tracks dust and particulate matter, increasing the discharges of polluted water into waters of the United States.

44.     During rain events storm water laden with pollutants discharges from the Facility to San Miguelito Creek, the Santa Ynez River, and the Pacific Ocean.

45.     Information available to Plaintiff indicates that as a result of these practices, storm water containing pollutants harmful to fish, plant and bird life, and human health are being discharged from the Facility directly to these waters during significant rain events.

46.     Information available to Plaintiff indicates that Defendants have not fulfilled the requirements set forth in the General Permit for discharges from the Facility due to the continued discharge of contaminated storm water.

47.     Plaintiff is informed and believes, and thereupon alleges, that Defendants have failed to develop and implement an adequate Storm Water Pollution Prevention Plan at the Facility.

48.     Information available to Plaintiff indicates the continued existence of unlawful storm water discharges at the Facility.

49.     Plaintiff is informed and believes, and thereupon alleges, that Defendants have failed to develop and implement adequate storm water monitoring, reporting and sampling programs at the Facility. Plaintiff is informed and believes, and thereupon alleges, that Defendants have not sampled with adequate frequency, have not conducted visual monitoring, and have not analyzed the storm water samples

Complaint For Declaratory and
Injunctive Relief and Civil Penalties

1  collected at the Facility for the required pollutant parameters.

2  Plaintiff is informed and believes, and thereupon alleges, that all of the violations

3  alleged in this Complaint are ongoing and continuing.

4  **VI.   CLAIMS FOR RELIEF**

5  **FIRST CLAIM FOR RELIEF**<br>**Discharges of Contaminated Storm Water From The Facility**<br>**in Violation of Permit Conditions and the Act**<br>**(Violations of 33 U.S.C. §§ 1311(a), 1342)**

6

7  50.     Plaintiff incorporates the allegations contained in the above paragraphs

8  as though fully set forth herein.

9  51.     Discharge Prohibition A(2) of the General Permit requires that storm

10  water discharges and authorized non-storm water discharges shall not cause or threaten

11  to cause pollution, contamination, or nuisance.  Receiving Water Limitations C(1) and

12  C(2) of the General Permit require that storm water discharges and authorized non-

13  storm water discharges shall not adversely impact human health or the environment,

14  and shall not cause or contribute to a violation of any water quality standards contained

15  in a Statewide Water Quality Control Plan, the applicable Regional Board's Basin Plan

16  or the CTR.

17  52.     Plaintiff is informed and believes, and thereupon alleges, that since at

18  least October 1, 1992, Defendants have been discharging polluted storm water from the

19  Facility into San Miguelito Creek, the Santa Ynez River, and the Pacific Ocean in

20  violation of the General Permit.

21  53.     During every significant rain event, storm water flowing over and

22  through materials at the Facility becomes contaminated with pollutants, flowing

23  untreated from the Facility into San Miguelito Creek, the Santa Ynez River, and

24  Pacific Ocean.

25  54.     Plaintiff is informed and believes, and thereupon alleges, that these

26  discharges of contaminated storm water are causing pollution and contamination of

27  waters of the United States in violation of Discharge Prohibition A(2) of the General

28

Complaint For Declaratory and
Injunctive Relief and Civil Penalties

Permit.

55.     Plaintiff is informed and believes, and thereupon allege, that these discharges of contaminated storm water are adversely affecting human health and the environment in violation of Receiving Water Limitations C(1) and C(2) of the General Permit.

56.     Plaintiff is informed and believes, and thereupon alleges, that these discharges of contaminated storm water are contributing to the violation of the applicable water quality standards in the Statewide Water Quality Control Plan, the applicable Regional Board's Basin Plan, and/or the CTR, in violation of Receiving Water Limitation C(2) of the General Permit.

57.     Plaintiff is informed and believes, and thereupon alleges, that every day since March 30, 1992, Defendants have discharged and continue to discharge polluted storm water from the Facility in violation of the General Permit. These violations are ongoing and continuous.

58.     Every day Defendants have discharged and continue to discharge polluted storm water from the Facility in violation of the General Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a).  Defendants are subject to civil penalties for each and every violation of the Act since June 10, 2010. *See* 33 U.S.C. §§1319 (d), 1365; 40 C.F.R. §19.4 (2008).

## SECOND CLAIM FOR RELIEF
### Failure to Develop and Implement an Adequate
### Storm Water Pollution Prevention Plan For the Facility
### (Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)

59.     Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

60.     Section A and Provision E of the General Permit require dischargers of storm water associated with industrial activity to develop and implement an adequate SWPPP no later than October 1, 1992.

61.     Defendants have failed to develop and implement an adequate SWPPP

for the Facility.  Defendants' ongoing failure to develop and implement an adequate SWPPP for the Facility is evidenced by, *inter alia*, Defendants' outdoor storage of industrial materials without appropriate best management practices; the continued exposure of significant quantities of industrial material to storm water flows; the failure to either treat storm water prior to discharge or to implement effective containment practices; and the continued discharge of storm water pollutants from the Facility at levels in excess of EPA benchmark values and other applicable water quality standards.

62.     Defendants have further failed to update the Facility's SWPPP in response to the analytical results of the Facility's storm water monitoring as required by the General Permit.  Defendants have been in violation of the SWPPP requirement every day since October 1, 1992.  Defendants continue to be in violation of the Act each day that they fail to develop and fully implement an adequate SWPPP for the Facility.  These violations are ongoing and continuous.

63.     Each day since October 1, 1992 that Defendants have failed to develop and implement an adequate SWPPP for the Facility in violation of the General Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a). Defendants are subject to civil penalties for each and every violation of the Act since June 10, 2010. *See* 33 U.S.C. §§1319 (d), 1365; 40 C.F.R. §19.4 (2008).

### THIRD CLAIM FOR RELIEF
**Failure to Develop and Implement the Best Available
And Best Conventional Treatment Technologies at the Facility
(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

64.     Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

65.     The General Permit's SWPPP requirements and Effluent Limitation B(3) require dischargers to reduce or prevent pollutants in their storm water discharges through implementation of BAT for toxic and nonconventional pollutants and BCT for conventional pollutants.

66.     Defendants have failed to implement BAT and BCT at the Facility for

Complaint For Declaratory and
Injunctive Relief and Civil Penalties

their discharges of Total Suspended Solids, Iron, Chemical Oxygen Demand, Total Organic Carbon, Specific Conductance and other unmonitored pollutants in violation of Effluent Limitation B(3) of the General Permit.

67.     Each day that Defendants have failed to develop and implement BAT and BCT at the Facility in violation of the General Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a).

68.     Defendants continue to be in violation of the BAT and BCT requirements each day that it fails to develop and fully implement BMPs meeting the BAT and BCT standards. These violations are ongoing and continuous.

69.     Defendants have been in violation of the BAT and BCT requirements at the Facility every day since at least June 10, 2010.  Defendants are subject to civil penalties for each and every violation of the Act since June 10, 2010.  *See* 33 U.S.C. §§1319 (d), 1365; 40 C.F.R. §19.4 (2008).

## FOURTH CLAIM FOR RELIEF
### Failure to Develop and Implement an Adequate
### Monitoring and Reporting Program for the Facility
### (Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)

70.     Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

71.     Section B of the General Permit requires dischargers of storm water associated with industrial activity to develop and implement a monitoring and reporting program (including, among other things, sampling and analysis of discharges) no later than October 1, 1992.

72.     Defendants have failed to develop and implement an adequate monitoring and reporting program for the Facility.  Defendants' ongoing failures to develop and implement adequate monitoring and reporting programs are evidenced by, *inter alia*, their continuing failure to collect and analyze storm water samples from all discharge locations, their continuing failure to analyze storm water samples for

Complaint For Declaratory and
Injunctive Relief and Civil Penalties

pollutants likely to be present in the Facility's storm water discharges in significant quantities and other pollutants, including Ammonia – 19 mg/L, Magnesium – 0.0636 mg/L, Biological Oxygen Demand – 30 mg/L, Arsenic – 0.16854 mg/L, Cadmium – 0.0159 mg/L, Cyanide – 0.0636 mg/L, Lead – 0.0816 mg/L, Mercury – 0.0024 mg/L, Selenium – 0.2385 mg/L, Silver – 0.0318 mg/L, Aluminum – 0.75 mg/L, Zinc – 0.117 mg/L, Nickel – 1.417 mg/L, and Magnesium – 0.0636 mg/L, as the General Permit requires, their failure and their failure to file required Annual Reports with the Regional Board which provide required documentation and information relating to visual observations and storm water sampling and analysis conducted at the Facility.

73.     Defendants have failed to develop and implement an adequate monitoring and reporting program for the Facility in each day since October 1, 1992. These violations are ongoing and continuous.

74.     Each day of violation of the General Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. §1311(a).  Defendants are subject to civil penalties for each and every violation of the Act since June 10, 2010. *See* 33 U.S.C. §§1319 (d), 1365; 40 C.F.R. §19.4 (2008).

## VII.   RELIEF REQUESTED

Wherefore, EcoRights respectfully requests that this Court grant the following relief:

a.   Declare Defendants to have violated and to be in violation of CWA section 301(a), 33 U.S.C. § 1311(a), for discharging pollutants from its the Facility in violation of a permit issued pursuant to CWA section 402, 33 U.S.C. § 1342 and for failing to comply with all substantive and procedural requirements of the General Permit and the CWA as alleged herein;

b.   Enjoin Defendants from discharging pollutants from the Facility and to the surface waters surrounding and downstream from the Facility in violation of the Act and the General Permit;

c.   Enjoin Defendants from further violating the substantive and

Complaint For Declaratory and
Injunctive Relief and Civil Penalties

1    procedural requirements of the General Permit;

2            d.  Order Defendants to pay civil penalties of $37,500 per day per

3    violation for all violations occurring after January 12, 2009, pursuant to Sections

4    309(d) and 505(a) of the Act, 33 U.S.C. §§ 1319(d) and 1365(a) and 40 C.F.R. §§

5    19.1–19.4 (2008);

6            e.  Order Defendants to take appropriate actions to restore the quality of

7    navigable waters impaired by their activities;

8            f.  Award Plaintiff's costs and fees (including reasonable attorney,

9    witness, and consultant fees) as authorized by the Act, 33 U.S.C. § 1365(d); and,

10            g.  Award any such other and further relief as this Court may deem

11    appropriate.

12   Dated: June 10, 2015                   Respectfully Submitted,

13                                          LAW OFFICES OF ANDREW L. PACKARD

14                                          By:    /s/ Andrew L. Packard

15                                          Andrew L. Packard

16   **Attorneys for Plaintiff**           ECOLOGICAL RIGHTS FOUNDATION

17

18

19

20

21

22

23

24

25

26

27

28

Complaint For Declaratory and
Injunctive Relief and Civil Penalties

**EXHIBIT A**

Law Offices Of

# ANDREW L. PACKARD

100 Petaluma Blvd N, Ste 301, Petaluma, CA 94952
Phone (707) 763-7227   Fax (707) 763-9227
Info@PackardLawOffices.com

April 10, 2015

VIA CERTIFIED MAIL
RETURN RECEIPT REQUESTED

Claudia Stine, Solid Waste Superintendent
Keith Quinlan, Solid Waste Superintendent
Gale Greer, Landfill Supervisor
City of Lompoc
100 Civic Center Plaza
Lompoc, CA 93436

Claudia Stine, Solid Waste Superintendent
Keith Quinlan, Solid Waste Superintendent
Gale Greer, Landfill Supervisor
City of Lompoc
P.O. Box 8001
Lompoc, CA 93438-8001

Gale Greer, Landfill Supervisor
City of Lompoc Sanitary Landfill
700 Avalon Road
Lompoc, CA 93436

**Re:**   **Notice of Violations and Intent to File Suit Under the Federal Water
Pollution Control Act ("Clean Water Act")**

Dear Ms. Stine, Mr. Quinlan and Mr. Greer:

This firm represents of the Ecological Rights Foundation ("ERF") in regard to
violations of the Clean Water Act ("the Act") occurring at the City of Lompoc's landfill
facility located at 700 Avalon Road, in Lompoc, California ("the Facility"). The WDID
number for the Facility is 3 42I001466. ERF is a non-profit public benefit corporation
dedicated to the preservation, protection and defense of the environment, wildlife and
natural resources of California waters, including San Miguelito Creek, the Lower Santa
Ynez River and the Pacific Ocean. This letter is being sent to you as the responsible
owners, officers, and/or operators of the Facility. Unless otherwise noted, Claudia Stine,
Keith Quinlan, Gale Greer, and the City of Lompoc shall hereinafter be collectively
referred to as "Lompoc."

This letter addresses Lompoc's unlawful discharges of pollutants from the Facility
to Lompoc's Municipal Separate Storm Sewer System, which conveys that storm water

Notice of Violation and Intent To File Suit
April 10, 2015
Page 2 of 19

to San Miguelito Creek, which then conveys that storm water into the Santa Ynez River and to the Pacific Ocean.  Lompoc is in ongoing violation of the substantive and procedural requirements of the Clean Water Act, 33 U.S.C. § 1251 *et seq.*, and National Pollutant Discharge Elimination System ("NPDES") General Permit No. CAS000001, State Water Resources Control Board Water Quality Order No. 91-13-DWQ, as amended by Order No. 92-12-DWQ and Order No. 97-03-DWQ ("Permit").

Section 505(b) of the Clean Water Act provides that sixty (60) days prior to the initiation of a civil action under Section 505(a) of the Act (33 U.S.C. § 1365(a)), a citizen must give notice of its intent to file suit.  Notice must be given to the alleged violator, the U.S. Environmental Protection Agency, and the State in which the violations occur.  *See* 40 C.F.R. § 135.2.  As required by the Clean Water Act, this Notice of Violation and Intent to File Suit provides notice of the violations that have occurred, and continue to occur, at the Facility.

Consequently, the City of Lompoc, Claudia Stine, Keith Quinlan and Gale Greer are hereby placed on formal notice by ERF that, after the expiration of sixty (60) days from the date of this Notice of Violation and Intent to File Suit, ERF intends to file suit in federal court against the City of Lompoc, Claudia Stine, Keith Quinlan and Gale Greer under Section 505(a) of the Clean Water Act (33 U.S.C. § 1365(a)), for violations of the Clean Water Act and the Permit.  These violations are described more fully below.

## I.      Background.

### A.  The Clean Water Act.

Under the Act, it is unlawful to discharge pollutants from a "point source" to navigable waters without obtaining and complying with a permit governing the quantity and quality of discharges.  *Trustees for Alaska v. EPA*, 749 F.2d 549, 553 (9th Cir. 1984). Section 301(a) of the Clean Water Act prohibits "the discharge of any pollutant by any person . . ." except as in compliance with, among other sections of the Act, Section 402, the NPDES permitting requirements.  33 U.S.C. § 1311(a).  The permit requirement extends to "[a]ny person who discharges or proposes to discharge pollutants. . . ."  40 C.F.R. § 122.30(a).

The term "discharge of pollutants" means "any addition of any pollutant to navigable waters from any point source."  33 U.S.C. § 1362(12).  Pollutants are defined to include, among other examples, a variety of metals, chemical wastes, biological materials, heat, rock, and sand discharged into water.  33 U.S.C. § 1362(6).  A point source is defined as "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, [or] conduit . . . from which pollutants are or may be discharged."  33 U.S.C. § 1362(14).  "Navigable waters" means "the waters of the United States" and includes, for example, traditionally navigable waters and tributaries to such waters.  33 U.S.C. § 1362(7); 40 C.F.R. § 122.2(c) and (e).  Navigable waters under the Act include man-made waterbodies and any tributaries or waters

Notice of Violation and Intent To File Suit
April 10, 2015
Page 3 of 19

adjacent to other waters of the United States.  *U.S. v. Moses*, 496 F.3d 984, 990-991 (9th Cir. Aug. 3, 2007), *rehearing en banc denied* (2007).

ERF is informed and believes, and thereupon alleges, that Lompoc has discharged, and continues to discharge, pollutants from the Facility to waters of the United States, through point sources, in violation of the terms of the Permit, every day that there has been or will be any measurable discharge of storm water from the Facility since March 27, 1992.  Each discharge, on each separate day, is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a).  These unlawful discharges are ongoing.  Consistent with the five-year statute of limitations applicable to citizen enforcement actions brought pursuant to the federal Clean Water Act, Lompoc is subject to penalties for violations of the Act since April 10, 2010.

## B.  Lompoc's Facility, Water Quality Standards, and EPA Benchmarks

The Facility falls under Standard Industrial Classification ("SIC") Code 4953 ("Hazardous Waste Treatment Storage or Disposal").  Lompoc submitted a Notice of Intent ("NOI") to discharge under the Permit in 1992.  ERF's investigations into the industrial activities on the 115-acre site indicate that the Facility is used to process and store waste paper, plastic, metals, and glass; scrap metals including aluminum and steel; waste oils and greases; treated wood wastes; agricultural waste; and electronic waste. The Facility also temporarily stores and processes general industrial and household hazardous waste, including: fluorescent light bulbs, ballasts, paints, stains, solvents, pesticides, herbicides, automotive products, and cleaning products. In addition the Facility stores tires, bicycles, and automotive scrap metal. Furthermore, the Facility also stores and processes green waste on site.

Lompoc collects and discharges storm water from the Facility through at least one (1) discharge point into Lompoc's Municipal Separate Storm Sewer System, which conveys that storm water to San Miguelito Creek, which then conveys that storm water into the Santa Ynez River and to the Pacific Ocean.  San Miguelito Creek, the Santa Ynez River, and the Pacific Ocean are "waters of the United States" within the meaning of the Clean Water Act.

The Central Coast Regional Water Quality Control Board ("Regional Board") has established water quality standards for San Miguelito Creek, and the Santa Ynez River in the "Water Quality Control Plan for the Central Coast Basin" ("Basin Plan").  The Basin Plan incorporates in its entirety the State Board's "Water Quality Control Plan for Ocean Waters of California" ("Ocean Plan").  The Ocean Plan "sets forth limits or levels of water quality characteristics for ocean waters to ensure the reasonable protection of beneficial uses and the prevention of nuisance.  The discharge of waste shall not cause violation of these objectives."  Ocean Plan, at 4.  The Ocean Plan limits the concentration of organic materials in marine sediment to levels that would not degrade marine life.  *Id*. at 6.  The Basin Plan establishes ocean water quality objectives, including that dissolved oxygen is not to be less than 7.0 mg/l and pH must be between 7.0 - 8.5 s.u.  *Id*. at III-2.

Notice of Violation and Intent To File Suit
April 10, 2015
Page 4 of 19

Furthermore, the Basin Plan identifies beneficial agricultural uses of the waters of San Miguelito Creek, and establishes a corresponding water quality standard for iron at 5.0 mg/L.  It also establishes that toxic metal concentrations in marine habitats shall not exceed: Cu – 0.01 mg/L; Pb – 0.01 mg/L; Hg – 0.0001 mg/L; Ni – 0.002 mg/L; and, Zn – 0.02 mg/L.  *Id.* at III-12.

The Basin Plan provides maximum contaminant levels ("MCLs") for organic concentrations and inorganic and fluoride concentrations, not to be exceeded in domestic or municipal supply.  *Id.* at III-6 - III-7.  It requires that water designated for use as domestic or municipal supply shall not exceed the following maximum contaminant levels: Aluminum – 1.0 mg/L; Arsenic - 0.05 mg/L; Lead - 0.05 mg/L; and Mercury - 0.002 mg/L.  *Id.* at III-7.  The EPA has also issued recommended water quality criterion MCLs, or Treatment Techniques, for Mercury - 0.002 mg/L; Lead – 0.015 mg/L; Chromium – 0.1 mg/L; and, Copper – 1.3 mg/L.

The EPA has also issued a recommended water quality criterion for Aluminum for freshwater aquatic life protection of 0.087 mg/L.  In addition, the EPA has established a secondary MCL, consumer acceptance limit for Aluminum - 0.05 mg/L to 0.2 mg/L, and for Zinc - 5.0 mg/L.  *See* http://www.epa.gov/safewater/ mcl.html.  Finally, the California Department of Health Services has established the following MCL, consumer acceptance levels: Aluminum – 1 mg/L (primary) and 0.2 mg/L (secondary); Chromium – 0.5 mg/L (primary); Copper – 1.0 mg/L (secondary); Iron – 0.3 mg/L; and Zinc – 5.0 mg/L.  *See* California Code of Regulations, title 22, §§ 64431, 64449.

The California Toxics Rule ("CTR"), issued by the EPA in 2000, establishes numeric receiving water limits for certain toxic pollutants in California surface waters. 40 C.F.R. § 131.38**.**  The CTR establishes the following numeric limits for freshwater surface waters:  Arsenic – 0.34 mg/L (maximum concentration); Chromium (III) – 0.550 mg/L (maximum concentration); Copper – 0.013 mg/L (maximum concentration); and Lead – 0.065 mg/L (maximum concentration).  The Regional Board has identified the Santa Ynez River as failing to meet water quality standards for pollutant/stressors such as Total Dissolved Solids, Sedimentation, and pH.[1]  Discharges of pollutants into a surface water body may be deemed a "contribution" to an exceedance of the CTR, an applicable water quality standard, and may indicate a failure on the part of a discharger to implement adequate storm water pollution control measures.  *Santa Monica Baykeeper v. Kramer Metals* (C.D. Cal. 2009) 619 F.Supp.2d 914, 926-927.

The EPA has published benchmark levels as guidelines for determining whether a facility discharging industrial storm water has implemented the requisite best available technology economically achievable ("BAT") and best conventional pollutant control technology ("BCT").  The following benchmarks have been established for pollutants

---

[1] *See* http://www.waterboards.ca.gov/water_issues/programs/tmdl/2010state_ir_reports/category5_ report.shtml.

Notice of Violation and Intent To File Suit
April 10, 2015
Page 5 of 19

discharged by Lompoc: Total Suspended Solids – 100 mg/L; Iron – 1.0 mg/L; and Chemical Oxygen Demand – 120 mg/L.  The State Water Quality Control Board has also proposed adding a benchmark level for Specific Conductance of 200 μmhos/cm and Total Organic Carbon – 110 mg/L.  Additional EPA benchmark levels have been established for other parameters that ERF believes are being discharged from the Facility, including but not limited to: Oil & Grease – 15.0 mg/L, Ammonia – 19 mg/L, Magnesium – 0.0636 mg/L, Biological Oxygen Demand – 30 mg/L, Arsenic – 0.16854 mg/L, Cadmium – 0.0159 mg/L, Cyanide – 0.0636 mg/L, Lead – 0.0816 mg/L, Mercury – 0.0024 mg/L, Selenium – 0.2385 mg/L, and Silver – 0.0318 mg/L.

Lompoc must analyze storm water samples for Total Suspended Solids (TSS), pH, Specific Conductance (SC), and Total Organic Carbon (TOC) or Oil and Grease (O&G).  *See* Permit Section B(5)(c)(i).  Lompoc must also analyze storm water samples for Ammonia (NH3), Magnesium (Mg), Chemical Oxygen Demand (COD), Arsenic (As), Cadmium (Cd), Cyanide (CN), Lead (Pb), Mercury (Hg), Selenium (Se), and Silver (Ag). *See* Permit, at Table D, Sections M and N.  Permit Section (B.5)(c)(ii)

## II.    Lompoc's Violations of the Permit.

Based on its review of available public documents, ERF is informed and believes that Lompoc is in ongoing violation of both the substantive and procedural requirements of the Clean Water Act, as discussed in detail below.

### A.   Lompoc Has Discharged Storm Water Containing Pollutants in Violation of Effluent Limitation B(3), Discharge Prohibition A(2), and Receiving Water Limitations C(1) and C(2).

The Permit prohibits any discharges of storm water associated with industrial activities that have not been subjected to BAT or BCT.  Effluent Limitation B(3) of the Permit requires dischargers to reduce or prevent pollutants in their storm water discharges through implementation of BAT for toxic and nonconventional pollutants and BCT for conventional pollutants.  BAT and BCT include both nonstructural and structural measures.  Permit, Section A(8).  Conventional pollutants are Total Suspended Solids, Oil & Grease, pH, Biochemical Oxygen Demand, and Fecal Coliform.  40 C.F.R. § 401.16.  All other pollutants are either toxic or nonconventional.  *Id*.; 40 C.F.R. § 401.15.

Further, Discharge Prohibition A(1) of the Permit provides:  "Except as allowed in Special Conditions D(1) of this Permit, materials other than storm water (non-storm water discharges) that discharge either directly or indirectly to waters of the United States are prohibited.  Prohibited non-storm water discharges must be either eliminated or permitted by a separate NPDES permit."  Special Conditions D(1) of the Permit sets forth the conditions that must be met for any discharge of non-storm water to constitute an authorized non-storm water discharge.  Discharge Prohibition A(2) provides: "Storm water discharges and authorized non-storm water discharges shall not cause or threaten to cause pollution, contamination, or nuisance."

Notice of Violation and Intent To File Suit
April 10, 2015
Page 6 of 19

Receiving Water Limitation C(1) of the Permit prohibits storm water discharges and authorized non-storm water discharges to surface or groundwater that adversely impact human health or the environment. Receiving Water Limitation C(2) of the Permit also prohibits storm water discharges and authorized non-storm water discharges that cause or contribute to an exceedance of any applicable water quality standards contained in a Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan.

Lompoc has discharged and continues to discharge storm water at unacceptable levels of Total Suspended Solids, Iron, Chemical Oxygen Demand, Total Organic Carbon, and Specific Conductance in violation of the Permit. These high pollutant levels have been documented during significant rain events, including the rain events indicated in the table of rain data attached hereto as Attachment A.[2] Lompoc's Annual Reports and Sampling and Analysis Results confirm discharges of specific pollutants in violation of the Permit provisions listed above. Self-monitoring reports under the Permit are deemed "conclusive evidence of an exceedance of a permit limitation." *Sierra Club v. Union Oil*, 813 F.2d 1480, 1493 (9th Cir. 1988).

The following discharges of pollutants from the Facility have violated Effluent Limitation B(3), Discharge Prohibition A(2) and/or Receiving Water Limitations C(1) and C(2) of the Permit:

1. **Discharge of Storm Water Containing Total Suspended Solids (TSS) at Concentrations in Excess of Applicable EPA Benchmark Value.**

| Date | Discharge Point | Parameter | Benchmark Value | Concentration in Discharge |
|------|-----------------|-----------|-----------------|----------------------------|
| 4/20/10 | Outfall 1 | TSS | 100 mg/L | 2846 mg/L |
| 12/17/10 | Outfall 1 | TSS | 100 mg/L | 9306 mg/L |
| 2/16/11 | Outfall 1 | TSS | 100 mg/L | 2778 mg/L |
| 10/05/11 | Outfall 1 | TSS | 100 mg/L | 307 mg/L |
| 4/26/12 | Outfall 1 | TSS | 100 mg/L | 6356 mg/L |
| 1/24/13 | Outfall 1 | TSS | 100 mg/L | 970 mg/L |

[2] Storm water is discharged from the Facility on dates that include but are not limited to, when 0.1 inches of rain falls.

Notice of Violation and Intent To File Suit
April 10, 2015
Page 7 of 19

| 2/28/14 | Outfall 1 | TSS | 100 mg/L | 916 mg/L |

**2.      Discharge of Storm Water Containing Iron (Fe) at Concentrations in Excess of Applicable EPA Benchmark Value.**

| Date | Discharge Point | Parameter | Benchmark Value | Concentration in Discharge |
|---|---|---|---|---|
| 4/20/10 | Outfall 1 | Fe | 1.0 mg/L | 64.9 mg/L |
| 12/17/10 | Outfall 1 | Fe | 1.0 mg/L | 22.2 mg/L |
| 2/16/11 | Outfall 1 | Fe | 1.0 mg/L | 71.7 mg/L |
| 10/05/11 | Outfall 1 | Fe | 1.0 mg/L | 7.28 mg/L |
| 4/26/12 | Outfall 1 | Fe | 1.0 mg/L | 93.8 mg/L |
| 11/30/12 | Outfall 1 | Fe | 1.0 mg/L | 6.21 mg/L |
| 1/24/13 | Outfall 1 | Fe | 1.0 mg/L | 18.2 mg/L |
| 2/28/13 | Outfall 1 | Fe | 1.0 mg/L | 18.1 mg/L |

**3.      Discharge of Storm Water Containing Chemical Oxygen Demand (COD) at Concentrations in Excess of Applicable EPA Benchmark Value.**

| Date | Discharge Point | Parameter | Benchmark Value | Concentration in Discharge |
|---|---|---|---|---|
| 4/20/10 | Outfall 1 | COD | 120 mg/L | 602 mg/L |
| 12/17/10 | Outfall 1 | COD | 120 mg/L | 2774 mg/L |
| 2/16/11 | Outfall 1 | COD | 120 mg/L | 976 mg/L |

Notice of Violation and Intent To File Suit
April 10, 2015
Page 8 of 19

| 10/05/11 | Outfall 1 | COD | 120 mg/L | 302 mg/L |
|---|---|---|---|---|
| 4/26/11 | Outfall 1 | COD | 120 mg/L | 928 mg/L |
| 11/30/12 | Outfall 1 | COD | 120 mg/L | 297 mg/L |
| 1/24/13 | Outfall 1 | COD | 120 mg/L | 594 mg/L |
| 2/28/14 | Outfall 1 | COD | 120 mg/L | 294 mg/L |

**4.      Discharge of Storm Water Containing Concentrations in Excess of Applicable EPA Benchmark Value.**

| Date | Discharge Point | Parameter | Benchmark Value | Concentration in Discharge |
|---|---|---|---|---|
| 10/05/11 | Outfall 1 | TOC | 110 mg/L | 239 mg/L |
| 4/26/12 | Outfall 1 | TOC | 110 mg/L | 239 mg/L |

**5.      Discharge of Storm Water Containing Specific Conductance (SC) at Concentrations in Excess of Proposed Benchmark.**

| Date | Discharge Point | Parameter | Benchmark Value | Concentration in Discharge |
|---|---|---|---|---|
| 4/20/10 | Outfall 1 | SC | 200 µmhos/cm | 421 µmhos/cm |
| 12/17/10 | Outfall 1 | SC | 200 µmhos/cm | 875 µmhos/cm |
| 2/16/11 | Outfall 1 | SC | 200 µmhos/cm | 1038 µmhos/cm |
| 10/05/11 | Outfall 1 | SC | 200 µmhos/cm | 2400 µmhos/cm |
| 4/26/12 | Outfall 1 | SC | 200 µmhos/cm | 920 µmhos/cm |
| 11/30/12 | Outfall 1 | SC | 200 µmhos/cm | 3231 µmhos/cm |

Notice of Violation and Intent To File Suit
April 10, 2015
Page 9 of 19

| 1/24/13 | Outfall 1 | SC | 200 μmhos/cm | 2128 μmhos/cm |
|---------|-----------|----|--------------|---------------|
| 2/28/14 | Outfall 1 | SC | 200 μmhos/cm | 953 μmhos/cm |

The above samples demonstrate violations of Effluent Limitation B(3). ERF's investigations, including a review of Lompoc's analytical results documenting pollutant levels in the Facility's storm water discharges well in excess of EPA's Benchmark values and the State Board's proposed benchmark level for Specific Conductance and Total Organic Carbon, indicate that Lompoc has not implemented BAT and BCT at the Facility for its discharges of Total Suspended Solids, Iron, Total Organic Carbon, and Specific Conductance in violation of Effluent Limitation B(3) of the Permit. Lompoc was required to have implemented BAT and BCT by no later than October 1, 1992 or the start of its operations. Thus, Lompoc is discharging polluted storm water associated with its industrial operations without having implemented BAT and BCT.

The sample data demonstrates that Lompoc's discharges adversely impact human health or the environment in violations of Receiving Water Limitation C(1) of the Permit, and that these discharges cause or threaten to cause pollution, contamination or nuisance in violation of Discharge Prohibition A(2). The above samples may also constitute violations of Receiving Water Limitation C(2) of the Permit, with respect to the discharge of parameters for which Lompoc has failed to undertake testing and which cause or contribute to an exceedance of applicable water quality standards, including CTR limits.

ERF is informed and believes that Lompoc has known that its storm water contains pollutants at levels exceeding EPA Benchmarks and other water quality criteria since at least April 10, 2010. ERF alleges that such violations also have occurred and will occur on other rain dates, including during every single significant rain event that has occurred since April10, 2010, and that will occur at the Facility subsequent to the date of this Notice of Violation and Intent to File Suit. Attachment A, attached hereto, sets forth each of the specific rain dates on which ERF alleges that Lompoc has discharged storm water containing impermissible levels of Total Suspended Solids, Iron, Total Organic Carbon and Specific Conductance in violation Effluent Limitation B(3), Discharge Prohibition A(2) and Receiving Water Limitations C(1) and C(2) of the Permit.

These unlawful discharges from the Facility are ongoing. Each discharge of storm water containing any pollutants from the Facility without the implementation of BAT/BCT constitutes a separate violation of the Permit and the Act. Each violation in excess of receiving water limitations and discharge prohibitions is likewise a separate and distinct violation of the Act. Consistent with the five-year statute of limitations applicable to citizen enforcement actions brought pursuant to the federal Clean Water Act, Lompoc is subject to penalties for violations of the Permit and the Act since April 10, 2010.

Notice of Violation and Intent To File Suit
April 10, 2015
Page 10 of 19

**B.** **Lompoc Has Failed to Implement BAT and BCT**.

Effluent Limitation B(3) of the Permit requires dischargers to reduce or prevent pollutants in their storm water discharges through implementation of BAT for toxic and nonconventional pollutants and BCT for conventional pollutants.  BAT and BCT include both nonstructural and structural measures.  Permit, Section A(8).  ERF's investigations, and the Facility's exceedances of EPA Benchmarks explained above, indicate that Lompoc has not implemented BAT and BCT at the Facility for its discharges of Total Suspended Solids, Iron, Total Organic Carbon,  Specific Conductance, and other unmonitored pollutants in violation of Effluent Limitation B(3) of the Permit.

To meet the BAT/BCT requirement of the Permit, Lompoc must evaluate all pollutant sources at the Facility and implement the best structural and non-structural management practices economically achievable to reduce or prevent the discharge of pollutants from the Facility.  Based on the limited information available regarding the internal structure of the Facility, ERF believes that at a minimum Lompoc must improve its housekeeping practices, store materials that act as pollutant sources under cover or in contained areas, treat storm water to reduce pollutants before discharge (e.g., with filters or treatment boxes), and/or prevent storm water discharge altogether.  Lompoc has failed to adequately implement such measures.

Lompoc was required to have implemented BAT and BCT by no later than October 1, 1992.  Therefore, Lompoc has been in continuous violation of the BAT and BCT requirements every day since October 1, 1992, and will continue to be in violation every day that it fails to implement BAT and BCT.  Lompoc is subject to penalties for violations of the Permit and the Act occurring since April 10, 2010.

**C.** **Lompoc Has Failed to Implement an Adequate Monitoring & Reporting Program.**

Section B of the Permit requires that dischargers develop and implement an adequate Monitoring and Reporting Program by no later than October 1, 1992 or the start of operations.  Sections B(3), B(4) and B(7) require that dischargers conduct regularly scheduled visual observations of non-storm water and storm water discharges from the Facility and to record and report such observations to the Regional Board.  Section B(5)(a) of the Permit requires that dischargers "shall collect storm water samples during the first hour of discharge from (1) the first storm event of the wet season, and (2) at least one other storm event in the wet season.  All storm water discharge locations shall be sampled." Wet Season is defined in the General Permit as the period from October 1 through May 30.  Permit  Section B(5)(a).  Section B(5)(c)(i) further requires that the samples shall be analyzed for Total Suspended Solids, pH, Specific Conductance, and Total Organic Carbon.  Oil and Grease may be substituted for Total Organic Carbon. Section B(5)(c)(ii) of the Permit further requires dischargers to analyze samples for all "[t]oxic chemicals and other pollutants that are likely to be present in storm water discharges in significant quantities."  Section B(10) of the Permit provides that "Facility

Notice of Violation and Intent To File Suit
April 10, 2015
Page 11 of 19

operators shall explain how the Facility's monitoring program will satisfy the monitoring program objectives of [Permit] Section B.2."

Based on their investigations, ERF is informed and believes that Lompoc has failed to develop and implement an adequate Monitoring & Reporting Plan. As an initial matter, based on their review of publicly available documents, ERF is informed and believes that Lompoc has failed to collect storm water samples during at least two qualifying storms events, as defined by the Permit, during three of the past five Wet Seasons. Second, based on their review of publicly available documents, ERF is informed and believes that Lompoc has failed to conduct the monthly visual monitoring of storm water discharges and the quarterly visual observations of unauthorized non-storm water discharges required under the Permit during four of the past five Wet Seasons. Furthermore, Lompoc has also failed to employ adequate testing methods in violation of the Permit, and failed to report the detection limits used in its sampling.

Further, Lompoc has failed to analyze storm water samples for all required constituents. As a facility enrolled under SIC Code 4953 Lompoc must also analyze samples for Ammonia, Magnesium, Chemical Oxygen Demand, Arsenic, Cadmium, Cyanide, Lead, Mercury, Selenium, and Silver. *See* Permit, Section B(5)(c)(iii) and Table D, Section N. It has failed to do so on every occasion that it sampled since April 10, 2010. Finally, based on its review of publicly available documents, ERF is informed and believes that Lompoc has failed to analyze samples for other pollutants that are likely to be present in significant quantities in the storm water discharged from the Facility including: Ammonia – 19 mg/L, Magnesium – 0.0636 mg/L, Biological Oxygen Demand – 30 mg/L, Arsenic – 0.16854 mg/L, Cadmium – 0.0159 mg/L, Cyanide – 0.0636 mg/L, Lead – 0.0816 mg/L, Mercury – 0.0024 mg/L, Selenium – 0.2385 mg/L, Silver – 0.0318 mg/L, Aluminum – 0.75 mg/L, Zinc – 0.117 mg/L, Nickel – 1.417 mg/L, and Magnesium – 0.0636 mg/L.

Each of these failures constitutes a separate and ongoing violation of the Permit and the Act. Consistent with the five-year statute of limitations applicable to citizen enforcement actions brought pursuant to the Clean Water Act, Lompoc is subject to penalties for violations of the Permit and the Act since April 10, 2010. These violations are set forth in greater detail below.

**1.      Lompoc Has Failed to Collect Qualifying Storm Water Samples During at Least Two Rain Events In Three of The Last Five Wet Seasons.**

Based on its review of publicly available documents, ERF is informed and believes that Lompoc has failed to collect storm water samples from all discharge points during at least two qualifying rain events at the Facility during three of the past five Wet Seasons, as required by the Permit. This is so, even though there were many qualifying storm events from which to sample (discussed further below).

Notice of Violation and Intent To File Suit
April 10, 2015
Page 12 of 19

In three of the past five Wet Seasons, Lompoc reported that the Facility sampled the first qualifying storm event of the season, when in fact it did not sample the first storm of the season during those three Wet Seasons. For example, Lompoc reported in its 2010-2011 Annual Report that it sampled the first qualifying storm event of the Wet Season on December 17, 2010. Based upon its review of publicly available rainfall data, ERF is informed and believes that the first qualifying storm event of the 2010-2011 Wet Season occurred as early as Wednesday, October 6, 2010, when 0.14" of rain fell on the Facility.

In addition, Lompoc reported in its 2013-2014 Annual report that it only sampled from one qualifying storm event, even though there were numerous opportunities to sample such an event. Further, in that same Annual Report, the storm event that Lompoc did sample was not a qualifying storm event. Based on its review of publicly available rainfall data, ERF is informed and believes that the storm that occurred at the Facility on March 28, 2014 was not a qualifying storm event because it rained 0.52" at the Facility on the day before. Thus, the March 27, 2011 storm event rendered any storm occurring for three days afterwards non-qualifying.

This failure to adequately monitor storm water discharges constitutes separate and ongoing violations of the Permit and the Act.

## 2.   Lompoc Has Failed to Conduct the Monthly Wet Season Observations of Storm Water Discharges Required by the Permit.

The Permit requires dischargers to "visually observe storm water discharges from one storm event per month during the Wet Season (October 1 – May 30)." Permit, Section B(4)(a). As evidenced by the entries on Form 4 Monthly Visual Observations contained in Lompoc's Annual Reports for four of the last five Wet Seasons, ERF is informed and believes that Lompoc has failed to comply with this requirement of the Permit.

Specifically, Lompoc failed to conduct monthly visual observations of discharges from qualifying storm events for all months during four of the past five Wet Seasons as required by the Permit. However, based on publicly available rainfall data, ERF is informed and believes that there were many qualifying storm events during each of these Wet Seasons that Lompoc could have observed. For example, Lompoc reported in its 2010-2011 Annual Report that it only conducted visual monitoring for three out of the eight months of the Wet Season. Based on its investigation of publicly available rainfall data, ERF is informed and believes there were many qualifying storm events during which Lompoc could have visually monitored the discharge from the Facility. *See* Attachment A.

Lompoc's failure to conduct this required monthly Wet Season visual monitoring extends back to at least April 10, 2010, and has caused and continues to cause multiple,

Notice of Violation and Intent To File Suit
April 10, 2015
Page 13 of 19

separate and ongoing violations of the Permit and the Act.

### 3. Lompoc's Failure to Employ Adequate Testing Methods in Violation of the Permit Since April 10, 2010.

Additionally, Lompoc is in violation of the Permit's requirement that the testing method employed in laboratory analyses of pollutant concentrations present in storm water discharged from the Facility be "adequate to satisfy the objectives of the monitoring program." Permit, Section B(10)(a)(iii).

In every single annual report filed by Lompoc, the test methods employed by the laboratory utilized by Lompoc to analyze the concentration of the pollutants present in the storm water discharged from its Facility did not comply with these Regional Board requirements. Specifically, the testing methods Lompoc utilized over past two Wet Seasons have differed dramatically leading to inaccurate or unreliable sample results that failed to meet the standard set forth in Section B(10)(a)(iii). For example, the testing methods applied by Lompoc for iron in 2013 was Test Method A3111B, while in 2014, Lompoc utilized Test Method E200.7. Furthermore, Lompoc completely failed to report the detection limits used in its storm water samples for the last five Annual Reports in violation of Permit requirements for filing accurate and complete Annual Reports, discussed further below. These are just a few of many examples of Lompoc's failure to adequately test the presence and concentration of pollutants at their storm water discharge points.

Lompoc is in violation of the Permit for failing to employ laboratory test methods that are adequate to, among other things, "ensure that storm water discharges are in compliance with the Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations specified in this Permit." Permit, Section B(2)(a) ("Monitoring Program Objectives").

ERF is informed and believes that publicly available documents demonstrate Lompoc's consistent and ongoing failure to implement an adequate Monitoring and Reporting Program in violation of Section B of the Permit. Accordingly, consistent with the five-year statute of limitations applicable to citizen enforcement actions brought pursuant to the federal Clean Water Act, Lompoc is subject to penalties for these violations of the Permit and the Act since April 10, 2010.

### 4. Lompoc's Failure to Analyze Storm Water Samples for All Required Constituents.

Moreover, Lompoc has failed to analyze storm water samples for all required constituents. Specifically, it has failed to ever analyze samples for Ammonia – 19 mg/L, Magnesium – 0.0636 mg/L, Biological Oxygen Demand – 30 mg/L, Arsenic – 0.16854 mg/L, Cadmium – 0.0159 mg/L, Cyanide – 0.0636 mg/L, Lead – 0.0816 mg/L, Mercury – 0.0024 mg/L, Selenium – 0.2385 mg/L, and Silver – 0.0318 mg/L, as required for

facilities enrolled under SIC Codes 4953. *See* Permit, Section B.5(c)(iii)*; Id. at* Table D, Section N.  It has failed to do so on every occasion that it sampled since April 10, 2010.

In addition, ERF is informed and believes that for the past five Wet Seasons, Lompoc has failed to analyze samples for other pollutants that are likely to be present in significant quantities in the storm water discharged from the Facility, including Aluminum – 0.75 mg/L; Zinc – 0.117 mg/L; Nickel – 1.417 mg/L; and Magnesium – 0.0636 mg/L.

Each failure to sample for all required constituents is a separate and distinct violation of the Permit and Clean Water Act.  Accordingly, Lompoc is subject to penalties for these violations of the Permit and the Act since April 10, 2010.

### D.    Lompoc Has Failed to Develop and Implement an Adequate Storm Water Pollution Prevention Plan.

Section A(1) and Provision E(2) of the Permit require dischargers of storm water associated with industrial activity to develop, implement, and update an adequate storm water pollution prevention plan ("SWPPP") no later than October 1, 1992.  Section A(1) and Provision E(2) requires dischargers who submitted an NOI pursuant to the Permit to continue following their existing SWPPP and implement any necessary revisions to their SWPPP in a timely manner, but in any case, no later than August 9, 1997.

The SWPPP must, among other requirements, identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm and non-storm water discharges from the Facility and identify and implement site-specific best management practices ("BMPs") to reduce or prevent pollutants associated with industrial activities in storm water and authorized non-storm water discharges (Permit, Section A(2)).  The SWPPP must also include BMPs that achieve BAT and BCT (Effluent Limitation B(3)).  The SWPPP must include: a description of individuals and their responsibilities for developing and implementing the SWPPP (Permit, Section A(3)); a site map showing the Facility boundaries, storm water drainage areas with flow pattern and nearby water bodies, the location of the storm water collection, conveyance and discharge system, structural control measures, impervious areas, areas of actual and potential pollutant contact, and areas of industrial activity (Permit, Section A(4)); a list of significant materials handled and stored at the site (Permit, Section A(5)); a description of potential pollutant sources including industrial processes, material handling and storage areas, dust and particulate generating activities, a description of significant spills and leaks, a list of all non-storm water discharges and their sources, and a description of locations where soil erosion may occur (Permit, Section A(6)).

The SWPPP also must include an assessment of potential pollutant sources at the Facility and a description of the BMPs to be implemented at the Facility that will reduce or prevent pollutants in storm water discharges and authorized non-storm water discharges, including structural BMPs where non-structural BMPs are not effective

Notice of Violation and Intent To File Suit
April 10, 2015
Page 15 of 19

(Permit, Section A(7), (8)).  The SWPPP must be evaluated to ensure effectiveness and must be revised where necessary (Permit, Section A(9),(10)).  Receiving Water Limitation C(3) of the Permit requires that dischargers submit a report to the appropriate Regional Water Board that describes the BMPs that are currently being implemented and additional BMPs that will be implemented to prevent or reduce the discharge of any pollutants causing or contributing to the exceedance of water quality standards.

ERF's investigations and reviews of publicly available documents regarding conditions at the Facility indicate that Lompoc has been operating with an inadequately developed or implemented SWPPP in violation of the requirements set forth above. Lompoc has failed to evaluate the effectiveness of its BMPs and to revise its SWPPP as necessary.  Accordingly, Lompoc has been in continuous violation of Section A(1) and Provision E(2) of the Permit every day since October 1, 1992, and will continue to be in violation every day that it fails to develop and implement an effective SWPPP.  Lompoc is subject to penalties for violations of the Permit and the Act occurring since April 10, 2010.

**E.      Lompoc Has Failed to Address Discharges Contributing to Exceedances of Water Quality Standards.**

Receiving Water Limitation C(3) requires a discharger to prepare and submit a report to the Regional Board describing changes it will make to its current BMPs in order to prevent or reduce the discharge of any pollutant in its storm water discharges that is causing or contributing to an exceedance of water quality standards.  Once approved by the Regional Board, the additional BMPs must be incorporated into the Facility's SWPPP.

The report must be submitted to the Regional Board no later than 60-days from the date the discharger first learns that its discharge is causing or contributing to an exceedance of an applicable water quality standard.  Receiving Water Limitation C(4)(a). Section C(11)(d) of the Permit's Standard Provisions also requires dischargers to report any noncompliance.  *See also* Provision E(6).  Lastly, Section A(9) of the Permit requires an annual evaluation of storm water controls including the preparation of an evaluation report and implementation of any additional measures in the SWPPP to respond to the monitoring results and other inspection activities.

As indicated above, Lompoc is discharging elevated levels of Total Suspended Solids, Iron, Total Organic Carbon, Specific Conductance, and other unmonitored pollutants that are causing or contributing to exceedances of applicable water quality standards.  For each of these pollutant exceedances, Lompoc was required to submit a report pursuant to Receiving Water Limitation C(4)(a) within 60-days of becoming aware of levels in its storm water exceeding the EPA Benchmarks and applicable water quality standards.

Notice of Violation and Intent To File Suit
April 10, 2015
Page 16 of 19

Based on ERF's review of available documents, Lompoc was aware of high levels of these pollutants long before April 10, 2010.  Lompoc has been in continuous violation of Receiving Water Limitation C(4)(a) and Sections C(11)(d) and A(9) of the Permit every day since April 10, 2010, and will continue to be in violation every day it fails to prepare and submit the requisite reports, receives approval from the Regional Board and amends its SWPPP to include approved BMPs.  Lompoc is subject to penalties for violations of the Permit and the Act occurring since April 10, 2010.

**F.      Lompoc Has Failed to File Timely, True and Correct Reports.**

Section B(14) of the Permit requires dischargers to submit an Annual Report by July 1st of each year to the executive officer of the relevant Regional Board.  The Annual Report must be signed and certified by an appropriate officer.  Permit, Sections B(14), C(9), (10).  Section A(9)(d) of the Permit requires the discharger to include in its annual report an evaluation of their storm water controls, including certifying compliance with the Permit.  *See also* Permit, Sections C(9) and (10) and B(14).

ERF's investigations indicate that Lompoc has submitted incomplete Annual Reports and purported to comply with the Permit despite significant noncompliance at the Facility.  For example, Lompoc reported in four Annual Reports filed for the past four Wet Seasons (i.e., 2010-2011, 2011-2012, 2012-2013 and 2013-2014) that it observed storm water discharges occurring during the first storm of those Wet Seasons.  However, as discussed above, based on ERF's review of publicly available rainfall data, ERF believes this is incorrect.

Further, Lompoc failed to sample from qualifying storm events in three out of last five Wet Seasons in violation of the permit.  For example in the 2013-2014 Annual Report Lompoc reported that it sampled from a storm event on March 28, 2014.  However based on publicly available rainfall data ERF is informed and believes that it the storm that occurred at the Facility on March 28, 2014 was not a qualifying storm event because 0.52 inches of rain fell on the Facility on March 27, 2014.  Thus, the March 27th storm event rendered any storm occurring for three days afterwards non-qualifying under the Permit.

These are but a few examples of how Lompoc has failed to file completely true and accurate reports.  As indicated above, Lompoc has failed to comply with the Permit and the Act consistently for the past five years; therefore, Lompoc has violated Sections A(9)(d), B(14) and C(9) & (10) of the Permit every time Lompoc submitted an incomplete or incorrect annual report that falsely certified compliance with the Act in the past five years.  Lompoc's failure to submit true and complete reports constitutes continuous and ongoing violations of the Permit and the Act.  Lompoc is subject to penalties for violations of Section (C) of the Permit and the Act occurring since April 10, 2010.

Notice of Violation and Intent To File Suit
April 10, 2015
Page 17 of 19

**IV.     Persons Responsible for the Violations.**

ERF puts the City of Lompoc, Claudia Stine, Keith Quinlan and Gale Greer on notice that they are the persons and entities responsible for the violations described above.  If additional persons are subsequently identified as also being responsible for the violations set forth above, ERF puts the City of Lompoc, Claudia Stine, Keith Quinlan and Gale Greer on formal notice that it intends to include those persons in this action.

**V.     Name and Address of Noticing Parties.**

The name, address and telephone number of each of the noticing parties is as follows: Ecological Rights Foundation, James Lamport, Executive Director, 867 B Redwood Drive, Garberville, California 95542.

**VI.     Counsel.**

ERF has retained legal counsel to represent it in this matter.  Please direct all communications to:

Andrew L. Packard
Megan Truxillo
Law Offices of Andrew L. Packard
100 Petaluma Boulevard North, Suite 301
Petaluma, CA 94952
Tel. (707) 763-7227
Email: Andrew@PackardLawOffices.com

**VII.     Penalties.**

Pursuant to Section 309(d) of the Act (33 U.S.C. § 1319(d)) and the Adjustment of Civil Monetary Penalties for Inflation (40 C.F.R. § 19.4) each separate violation of the Act subjects the City of Lompoc, Claudia Stine, Keith Quinlan and Gale Greer to a penalty of up to $37,500 per day per violation for all violations occurring during the period commencing five years prior to the date of this Notice of Violations and Intent to File Suit.  In addition to civil penalties, ERF will seek injunctive relief preventing further violations of the Act pursuant to Sections 505(a) and (d) (33 U.S.C. §1365(a) and (d)) and such other relief as permitted by law.  Lastly, Section 505(d) of the Act (33 U.S.C. § 1365(d)) permits prevailing parties to recover costs and fees, including attorneys' fees.

ERF believes this Notice of Violations and Intent to File Suit sufficiently states grounds for filing suit.  We intend to file a citizen suit under Section 505(a) of the Act against the City of Lompoc, Claudia Stine, Keith Quinlan and Gale Greer and their agents for the above-referenced violations upon the expiration of the 60-day notice period.  If you wish to pursue remedies in the absence of litigation, we suggest that you initiate those discussions within the next 20 days so that they may be completed before the end of

Notice of Violation and Intent To File Suit
April 10, 2015
Page 18 of 19

the 60-day notice period.  We do not intend to delay the filing of a complaint in federal court if discussions are continuing when that period ends.

Sincerely,

Andrew L. Packard
Counsel for
Ecological Rights Foundation

Notice of Violation and Intent To File Suit
April 10, 2015
Page 19 of 19

## <u>SERVICE LIST</u>

Gina McCarthy, Administrator
U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Washington, D.C. 20460

Jared Blumenfeld
Administrator, U.S. EPA – Region 9
75 Hawthorne Street
San Francisco, CA, 94105

Eric Holder
U.S. Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, DC 20530-0001

Thomas Howard, Executive Director
State Water Resources Control Board
1001 I Street Sacramento, CA 95814
P.O. Box 100
Sacramento, CA 95812-0100

Kenneth A. Harris, Jr., Executive Officer
Regional Water Quality Control Board
Central Coast Region
895 Aerovista Place, Suite 101
San Luis Obispo, CA 93401-7906

**ATTACHMENT A**
**Notice of Intent to File Suit, City of Lompoc**
**Significant Rain Events,\* April 10, 2010 – April 10, 2015**

| | | |
|---|---|---|
| April 11, 2010 | November 20, 2011 | February 28, 2014 |
| April 12, 2010 | December 12, 2011 | March 1, 2014 |
| April 20, 2010 | January 21, 2012 | March 2, 2014 |
| April 21, 2010 | January 23, 2012 | March 26, 2014 |
| October 6, 2010 | February 7, 2012 | March 31, 2014 |
| October 19, 2010 | February 13, 2012 | April 1, 2014 |
| October 29, 2010 | March 17, 2012 | October 31, 2014 |
| October 30, 2010 | March 18, 2012 | November 1, 2014 |
| November 7, 2010 | March 25, 2012 | December 2, 2014 |
| November 19, 2010 | March 31, 2012 | December 3, 2014 |
| November 20, 2010 | April 10, 2012 | December 12, 2014 |
| November 21, 2010 | April 11, 2012 | December 15, 2014 |
| November 23, 2010 | April 12, 2012 | December 16, 2014 |
| December 5, 2010 | April 13, 2012 | January 10, 2015 |
| December 17, 2010 | April 25, 2012 | January 11, 2015 |
| December 18, 2010 | October 22, 2012 | February 7, 2015 |
| December 19, 2010 | November 17, 2012 | March 2, 2015 |
| December 20, 2010 | November 30, 2012 | April 7, 2015 |
| December 21, 2010 | December 1, 2012 | |
| December 22, 2010 | December 2, 2012 | |
| December 25, 2010 | December 12, 2012 | |
| December 29, 2010 | December 15, 2012 | |
| January 2, 2011 | December 17, 2012 | |
| January 30, 2011 | December 22, 2012 | |
| February 16, 2011 | December 23, 2012 | |
| February 18, 2011 | December 24, 2012 | |
| February 19, 2011 | December 25, 2012 | |
| February 25, 2011 | December 26, 2012 | |
| March 2, 2011 | December 29, 2012 | |
| March 18, 2011 | January 5, 2013 | |
| March 19, 2011 | January 6, 2013 | |
| March 20, 2011 | January 24, 2013 | |
| March 23, 2011 | January 25, 2013 | |
| March 24, 2011 | February 8, 2013 | |
| March 26, 2011 | February 19, 2013 | |
| April 7, 2011 | February 20, 2013 | |
| May 16, 2011 | March 7, 2013 | |
| May 17, 2011 | March 31, 2013 | |
| June 4, 2011 | November 20, 2013 | |
| June 5, 2011 | November 29, 2013 | |
| June 6, 2011 | December 7, 2013 | |
| October 4, 2011 | February 2, 2014 | |
| October 5, 2011 | February 6, 2014 | |
| November 6, 2011 | February 26, 2014 | |
| November 11, 2011 | February 27, 2014 | |

\* Dates gathered from publicly available rain and weather data collected at stations located near the Facility.